New Life Ventures, Inc.  Good morning, your honors. May it please the court. I'll begin by jumping right in on this issue of symbolic, and does this symbolic somehow make a label special and something different from what has been known for years in library cards and supermarkets on bags of potato chips, as they say in the file history. And the answer is no. There's nothing about this symbolic that makes anything different or anything special. So even if we were to just set aside the question and assume that there's nothing symbolic on a library card, which is not correct. There are things which are symbolic in a library card. But if we were to just set that aside, if you were to take the information on a library card and put it into a computer, it's necessarily become symbolic by that fact. You have ones and zeros in a computer which are now representing the information that is on the library card, and you would search for those ones and zeros in the computer whenever you did a search in any kind of database that has been around since the 70s, as we showed. But his point would be that that is too high an abstraction because he's not just talking about searching for a book. He's saying that you can search for categories of books and you can provide all kinds of sub-data. So I want a book. I also want a mystery, but I want a mystery written by a certain category of author. I want it within a period of years, and I want to have it addressing a particular time frame. I mean, that's a lot more information than you would get on a library card. The way you put it there, that is absolutely true, Your Honor. There are many layers of categories in a way. I think the Library of Congress number comes very close to what you just said because it says within this category, it's within fiction, and then within fiction it might be historical fiction, and within that it might be mysteries related to the French Revolution or something like that. So there is a drilling down that occurs in the library card. But his point is that on the computer, he says at this point in time, that really all you could do is keyword searches. And a keyword search, as we all know, having been frustrated by keyword searches, don't get you all that far. Don't narrow things as much as you might want to narrow them. So I want to make two points in response to that. I think number one, it's factually incorrect, and we've shown that in the record. So there were sophisticated database searches available at the time that Mr. Gonzalez himself admitted in his testimony that he didn't invent multi-parameter searching. That was already available. It was already being done on computers. The SQL article that we put in the record also shows that. So factually I think that's incorrect. I also want to address the fact that that's just not required by any of the claims. So the claims here require a single parameter in the search. And in none of this argument did you hear anything saying what you just described in your hypothetical and connecting that to the claims. So even if Mr. Gonzalez had had that in mind, which I dispute, but even if he had, that's not what we're arguing about here. What we're arguing about here is what do these claims require. And just to explain the point in particular, the most specific claim, I think there would be no dispute that in the 807 patent, the second patent, the claims only require a single digital label. And that would be male or female. I think the patent uses the example of a zero to indicate male and a one to indicate female. The closest that they come to any sort of multi-parameter labeling is in the 665 patent, where in claim one, and this is on page APPX0150, you do have to gather multi-parameter qualitative data. But when you get down to the element which requires a search, so the gathering, that's the first element in claim one. You go down to the element that starts with manipulation in claim one of the 665 patent. It says that you have to match parameters stipulated by an entity conducting a search and represent it in the digital labels. And here's the critical language. According to at least one of the presence of, absence of, numerical or other value contained in, numerical or other value not contained in, any one, all, and any configuration of the labels. So in other words, if there is a presence of a variable in any one of the labels, you've satisfied the language in the 665 patent. There's no requirement that you have to conduct a multi-variable search. And the dependent claims don't do that either? Correct, Your Honor. None of the claims that are at issue do that. Though I would submit that that's not even pertinent, because even if there were a requirement that you had to do a multi-variable search in the claims, and that was what we were arguing about, number one, that's still possible with library cards. Number two, it's admitted that it's old technology, admitted by their inventor, demonstrated by the uncontested evidence. So if it's routine and conventional to use a database to perform a multi-variable search, that routine conventional technology can't be used to demonstrate that they came up with some sort of technological invention. I think what's particularly important here is when you look at the record, it's unambiguous that the sole inventor stated repeatedly in his provisional application, in his patent itself, and in the file history, that what he was doing was taking something which was old and well-known by his own testimony and his own statements, and applying it to a new context, the context of websites on the Internet. Can I ask this? My general recollection is that the context in which we have said, and the Supreme Court indicated, and Alice, of taking something from outside the computer world and saying, use a computer to do it, maybe had the following difference from this case. This case is one in which the computer context, namely the Internet context, already had a well-established contrary different arrangement, rather than taking a process for selling out in the world and saying, put the information on a computer. This is saying the Internet search systems that are in place and everybody is using are actually established and different from what has gone on in the non-Internet world. Let's do the old world in the new world. Is there anything to be made of that? I think that's what they're trying to do in invoking DDR and BASCM, which are probably the two most relevant cases, that there was a way that the Internet was set up, and in those two cases somebody did something different, they changed that. And this is like that even if the change comes from something familiar. I agree that that's the story they're trying to tell, that my opponent is trying to tell. I don't agree that it's correct, or even remotely correct. I think you can tell from within the context of the patent itself that that's not correct, it's inconsistent with the patent. The patent itself talks about performing a word search within what it calls a hybrid digital label in column six. Second of all, there's a direct admission from the inventor that searching for single parameter digital labels was commonplace before his invention, and it was not something he admitted. I'm sorry, not something that he invented. So I don't agree with the sort of factual premise. I do think that is the story that they're trying to tell in order to draw the analogy that you just described. But number one, it's factually incorrect. And number two, I don't think it works, because I don't think even if it were true, it would bring this case into the kind of situation that you had in BASCM or DDR. So I think something that's very important to understand is, my sense from reading the 101 cases, is that there's a very big difference between a situation where someone has created a new algorithm, and the algorithm may not be patentable on its own, but they've taken that new algorithm and they've put it in the context of a specific process. That type of case where the abstract idea or the unpatentable part of the claim is new is a very different situation where what you have is an idea like you had in Alice, where it was something, it was a financial practice that had been going on for a very, very long time. And then they've taken that old abstract idea and tried to clothe it in the language of a computer and a database and the internet and argue that it is now something that is patentable. I would submit that there's a different weighing that occurs, and I'm not sure I can articulate very well how the federal circuit, your court, has done, but I think that's a very different thing. And I think that what happened in BASCM and DDR, the two cases that you are describing, and I think it comes out in the way that you described it, is there was a sense that the unpatentable part of those claims was something that was unconventional and different. Here, nothing could be further from the truth. There is express admission by the sole inventor that he didn't invent it, that it was commonplace beforehand. He draws an analogy in his patent to library cards. In the file history... Well, you may say he may concede that digital labeling was not something he invented, but his point is that he believes he invented a better way to search those labels once they are put in place. I don't think that's correct. The quotes are in our brief. I can read them again. I don't think that's correct at all. So this search for the symbolic label, the quote from the patent, it says, an example of two-parameter labeling is to label a list of people. In computer field A, place a zero or a one to indicate if a person is a male or a female. And when he talks about how to do the search, he says, and this is in column three, I'm not finding it immediately, but it's in column three and it says, you scan the database. So scanning a database for something like a one or a zero that's representative of something, there's just no way he's going to argue that that is novel. It's clearly not. It's not something that he invented. He admits he didn't invent even multi-parameter searching through a database. Again, that's in our briefs. Do you want to get to your cross-appeal before you sit down? Yes. You're on. So I think fundamentally the issue on the cross-appeal... Let me just ask this question. It seems to me, fairly enough, you just described and had to do some work to describe the difficulties of identifying the precise boundaries of cases like DDR and Bascom. Doesn't that tell you that it was not exceptional for them to think they could overcome the 101 hurdle in this case? Because even by 2016, there were significant areas of grayness. Your Honour, the answer to that would be yes, if that was the only evidence that we had. But it's not. And the core evidence that we have here is that Mr. Gonzales knowingly pursued claims... The other thing they stress, of course, is that the jury went their way. It's very difficult, isn't it, to say that in the context of everything that gets here, it was so exceptional as to require attorney's fees. Is there an answer to that? My answer to that, Your Honour, would be to come back to the same thing. We didn't have a net rule of conduct claim in front of the jury. But what we have now is very clear evidence that he made false statements to the patent office... No, you say very clear evidence. I think that's a little of a stretch. You said that at trial he was shown the eBay system and he said, well, yeah, I didn't invent that, and that was there. But there's no evidence that he knew about that at the time that he was applying for this patent. Let me be very precise about what I think the most important evidence is. I'm going to read you three passages, and I'll give you the citations for them. So he stated to the patent office, there is no prior art at all for website labels. That's 1617, APPX 1617. There's the quote I've already mentioned. He said that while labels are common in physical form, it has not heretofore been used or proposed in digital form for websites. That's 1375. And then again, the simple fact is that websites do not have labels. 1615. He has admitted, and I can read it as well, that he did not invent digital labels for websites. That admission is squarely inconsistent. But I thought in context what he was saying he now realizes he didn't. At the time he said that, he's not saying he knew that it was a lie. I see. I'm sorry I misunderstood your question. There is an argument about eBay, which we are also pressing, and we made in the briefs. The quotes that I just referred to here, and the quote where he admits that digital labeling was in fact commonplace, had nothing to do with eBay. In fact, if you look at that passage, which is 1879, and then also 2090. If you look at those two passages, he was talking about the Yahoo website, not about eBay. And he admits that Yahoo had digital labels and that it was commonplace. Right, but that's not the full extent of the claims, right? He has the claims require digital labels plus, right? People's sources creating them and so on. Correct, Your Honor. So just the admission that he didn't invent digital labels doesn't invalidate the claims because there are other elements. But what it does do is show that when he said at least three times, and I think there are more in the briefs, there is no prior art at all for website labels. It has not heretofore been used or proposed in digital form for websites. The simple fact is that websites do not have labels. When he makes those statements to the patent office, he knows they're false. And that makes this case different. That's important. The title of this patent is Digital Labels for Websites. It's the core of what he is arguing he invented. Mr. Fuller got up here and argued that the fundamental thing is something about digital labels are special because they're symbolic and that's what makes this case patentable. It's the core of it and he knows he didn't invent it. And he admitted that in his deposition and he admitted it in trial. Now, we got to trial. We shouldn't have got to trial. We filed a motion nine months before trial, before a claim construction hearing, making our 101 argument. That was not ruled on. We were never given permission to file our summary judgment motion until two weeks before trial. That finally occurred. The judge held the trial before resolving.  Correct, Your Honor. Doesn't that indicate that maybe even if you're right under 101 in the long run, that reasonable minds could differ on that? I don't agree. I think you'd have to read the opinion in order to fairly assess that. But let's suppose that reasonable minds could differ on the 101 issue. I think this is similar to the question Judge Taranto asked me. What makes this case different from just the 101 cases, here we have an inventor who's admitted that something is true that is directly inconsistent with something he repeatedly told the patent office in order to get his patent. And at a minimum, that is evidence of bad faith in pursuing this case. That's a very, very significant fact. When you add into the fact there were 13 settlements, and that's a lot, 13 settlements, for an average of $65,000, which is less than 10% of the cost of defense. If you look at the AIPLA evidence that we put in, the average cost of defending a patent case against a non-practicing entity where the amount is less than $1 million, so all the minimum categories, the average cost was $820,000. Right. I was the one who wrote some of the opinions that said this is a factor that the court could consider. But it could also be true that he thought his best case was against you all, and he funded that case by smaller settlements. That doesn't make it necessarily bad faith. I mean, he got pretty far. The jury said you were infringing. I think all of that is true, Your Honor. None of it by itself might get us there. But I think when you put it together, it does get us there. At a minimum, the district court should have looked at the fact that there are all these statements that were made to the patent office that are admitted to be false. That's very important. When you combine that with all these nuisance value settlements, and the argument in response is, well, we made it to trial. The reason we made it to trial is because our client refused to settle. And it can't be held against us that we refused to settle. We did everything that we should have done. Long before the case got into discovery, before depositions were taken, before claim construction, we had sought permission. But if you were so sure that he didn't invent it, then why did the jury not rule in your favor under 102 and 103? I should have tried a better case, Your Honor. All right. Let's hear from the other side and get a bit of rebuttal on the cross-appeal. Okay, let's see. Mr. Fuller, you can respond to the cross-appeal or use your time on the merits. Am I limited to the cross-appeal at this moment, Your Honor? Okay. Or can I address some of the points he made relative to the 101 issue? Well, whatever you need to tell us. Okay, thank you, Your Honor. First of all, we know from cases like Diamond v. Aguirre that even something like a mathematical equation, even something that may have been technically old, can still be put to a new and useful patent-eligible result. And that is exactly to the extent we believe what my co-partner just said, that everything was old. Gonzales didn't invent anything new. Well, even still, you can take something that may have been individually known in the art. That is not the test. We don't take individual pieces from a claim, discount them, and then say what's left. We'll look at the claim as an entire ordered combination set of steps. And in this case, what we have is Mr. Gonzales inventing something patent-eligible, which we've discussed. We have... This is not a novelty case. We're not here on 102-103. That seems to be what Mr. Brown wants to go to. The question is not, did he invent something new and non-obvious? The question is, at this juncture, is what Mr. Gonzales claims eligible to even get through the front door and be considered for 102-103? We have this coarse filter of one-on-one. And we believe Mr. Gonzales has satisfied at least step one of the Mayo test in that his invention is not abstract. But even if we get to step two of the test, we believe that he has inventive concepts added to that that take it beyond the realm of abstract. And that's all in our briefs. As to the attorney's fees question, to your point, Judge O'Malley, at minimum, reasonable minds can differ on the one-on-one question. We have Magistrate Judge Payne who wrote a very well-reasoned report. I do invite your honor to read Judge Payne's opinion because I think it's very instructive to where this court is today. Judge Payne considered step one in its entirety far more completely, quite frankly, than Judge Gilstrap did in his order where he found the claims to be non-patent eligible. And then on top of that, even though he found the claims to be eligible under step one, he continued on to step two and said, even if the claims are drawn to an abstract idea, I still find the claims have enough to get them to, A, avoid the preemption question, which is the overriding concern behind the exclusionary rule in the first place. The Gonzalez claims are very specific. They do not preempt some building block of ingenuity like looking for information on the Internet. To the extent they preempt anything, they preempt exactly what the patent law says they can preempt. They preempt only what is claimed. They preempt a method where you, A, source information directly from the owner or creator of a website, very narrowly. Then they preempt the conversion of that information into something symbolic. Again, very narrow, not a building block. Then, to make it even more specific and concrete, he says, we're going to search based on the labels, not on the information. This is not a case where preemption is a concern. Counsel hasn't even argued preemption. Judge Gilstrap, in his opinion, the word preemption doesn't even appear in the order. Judge Gilstrap didn't consider preemption at all, which, again, is the overriding concern of the 101 exclusionary rule. If the court has any questions on the attorney's fees issue, I'd be glad to answer them, but plainly, there was no inequitable conduct claim made. Mr. Gonzalez did what every patentee does in the patent office. He argued, my claims are novel. They're non-obvious, and as the court recognized, the jury in Texas agreed. There is nothing extraordinary or exceptional about this case to the extent the court even reaches the attorney's fees question. The court should completely reject and affirm there was no abuse of discretion on the part of Judge Gilstrap. Okay, thank you. Okay, Mr. Brown, you get the last word, but the last point in the discretionary standard is something you need to overcome. You know, I'll make two points. The first is, I don't think reasonable minds can differ on the 101 question in this particular case, given all the evidence in this case. So, with the statements that were made in the summer of the invention, drawing an analogy to a library card, with the statement made squarely to the examiner repeatedly that this is taking an idea that is already common in physical form and putting it only into digital form, given that, I don't think there is room for reasonable minds to differ on the 101 question. And on the attorney's fees question, I just want to come back again. It is not a situation where all he said is, oh, my patent is new. He made statements to the patent office which have been directly contradicted by what he was forced to admit in his deposition in the case. I think that is an unusual situation, when the inventor admits that he didn't invent the core piece of what he claims to have invented, what he titled his patents, what he told the patent office repeatedly he invented, and he admits he didn't invent it. That is unusual, and that makes this an exceptional case. Thank you. Any more questions? Thank you. Thank you both. The case is taken under submission.